UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Stonyfield Farm, Inc.
        Plaintiff and
        Counterclaim-Defendant

        v.                                    Civil No. 08-cv-488-JL
                                              Opinion No. 2009 DNH 150
Agro-Farma, Inc.
        Defendant and
        Counterclaim-Plaintiff

        v.

Schreiber Foods, Inc.
        Counterclaim-Defendant

### OPINION AND ORDER

This case involves a dispute among yogurt manufacturers over a relationship gone sour.  The plaintiff, Stonyfield Farm, Inc., alleges that the defendant, Agro-Farma, Inc., which had been manufacturing Greek yogurt for Stonyfield for more than a year, delivered defective goods in violation of its warranties and then intentionally terminated the relationship in violation of its contractual obligations and consumer protection laws.  Agro-Farma, which blames Stonyfield for the breakdown of the relationship, has brought various counterclaims against Stonyfield and its current Greek yogurt manufacturer, Schreiber Foods, Inc., alleging that they have been misappropriating Agro-Farma's trade secrets and other confidential information.

Stonyfield and Schreiber have now moved, under Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings with respect to four of Agro-Farma's counterclaims,[1] which they contend are pre-empted by New Hampshire's version of the Uniform Trade Secret Act ("UTSA"). See N.H. Rev. Stat. § 350-B:7. Both sides agree that if New Hampshire law applies, it pre-empts all four counterclaims. They disagree, however, about the proper choice of law. Agro-Farma argues that New York law applies and provides no basis for pre-emption because New York has not adopted the UTSA.

This court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity). After holding oral argument, the court grants the motion. Under both a contractual choice-of-law provision and general choice-of-law principles, New Hampshire law governs Agro-Farma's counterclaims and pre-empts the ones targeted in Stonyfield and Schreiber's motion.

## I. **Applicable legal standard**

A motion for judgment on the pleadings under Rule 12(c) is evaluated under essentially the same standard as a Rule 12(b)(6)

---

[1]The specific counterclaims at issue are Counts 4 (misappropriation of ideas), 5 (unfair competition), 6 (unjust enrichment), and 7 (constructive trust).

motion for failure to state a claim.  <u>Perez-Acevedo v. Rivero-Cubano</u>, 520 F.3d 26, 29 (1st Cir. 2008); <u>Pasdon v. City of Peabody</u>, 417 F.3d 225, 226 (1st Cir. 2005).  To survive such a motion, the party bringing the claims (here, Agro-Farma) must make "factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true.'"  <u>Simmons v. Galvin</u>, 575 F.3d 24, 30 (1st Cir. 2009) (quoting <u>Perez-Acevedo</u>, 520 F.3d at 29 (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007))).  Because a Rule 12(c) motion "calls for an assessment of the merits of the case at an embryonic stage," the facts must be construed in the light most favorable to Agro-Farma, drawing all reasonable inferences in its favor.  <u>Perez-Acevedo</u>, 520 F.3d at 29.  The court is not, however, confined to the complaint; it may consider "the pleadings as a whole," including "documents the authenticity of which are not disputed by the parties; . . . documents central to the plaintiff's claim; [and] documents sufficiently referred to in the complaint."  <u>Curran v. Cousins</u>, 509 F.3d 36, 43-44 & n.5 (1st Cir. 2007) (quotation omitted).  With the facts so construed, questions of law are ripe for resolution at the pleadings stage.  <u>Simmons</u>, 575 F.3d at 30.  The following statement of facts conforms to those requirements.

## II.  **Background**

Two yogurt manufacturers, Stonyfield and Agro-Farma, entered into a co-packing relationship in 2006, under which Agro-Farma (located in New York) began to produce non-fat yogurt for Stonyfield (located in New Hampshire) to market under Stonyfield's brand name.  At the outset, both parties signed a Confidentiality and Nondisclosure Agreement ("NDA"), prepared by Stonyfield without input from Agro-Farma, that "set forth the terms and conditions that apply when one party discloses Confidential Information[2] to the other to ensure the protection of such information."  NDA, Recital 3.  The NDA contained a choice-of-law provision, which stated in full:  "This Agreement shall be construed in accordance with, and governed by, the laws of the State of New Hampshire, without application of its choice of law provisions."  Id. at § 9.1.

Shortly into the relationship, Stonyfield and Agro-Farma began discussing the possibility of developing another type of

---

[2]The NDA defines the term "Confidential Information" broadly to mean "the data, know-how, trade secrets, patents, engineering specifications, material formulations, product concepts, formulae, recipes, ingredients, devices, techniques, financial or budgetary information, costs, customer and supplier lists, marketing and sales information, and other information related to the business activities of the Disclosing Party, regardless of any restrictive markings, and which the Receiving Party learns or receives from the Disclosing Party."  NDA at § 1.1.

4

yogurt -- organic Greek yogurt -- also to be manufactured by
Agro-Farma in New York and marketed by Stonyfield.  Unlike most
other types of yogurt sold in this country, Greek yogurt is
strained to remove the whey, resulting in a creamier product,
richer in protein and lower in lactose.  Stonyfield had never
before produced or marketed Greek yogurt and did not have the
knowledge and expertise necessary to do so.  Agro-Farma, however,
did have such knowledge and expertise.

As these discussions continued, Stonyfield requested that
Agro-Farma share confidential information about the production
processes, equipment, and ingredients it would use to produce the
new Greek yogurt, including the names of specific yogurt
cultures.  Agro-Farma agreed to do so on a confidential basis,
pursuant to the NDA and other oral assurances from Stonyfield.
During the next year-and-a-half, representatives from Stonyfield
made more than one hundred trips to Agro-Farma's facility in New
York to observe yogurt production.  A few business meetings were
also held in New Hampshire.

Agro-Farma began production of the new Greek yogurt, called
"Oikos," in May 2007, about a year after the discussions began.
From time to time, Stonyfield sent purchase orders to Agro-Farma
for additional quantities of Oikos, which Agro-Farma produced and
delivered to Stonyfield in New York on the dates requested.

Agro-Farma then submitted invoices for the delivered product, and Stonyfield regularly paid them.  Other than the NDA mentioned above, the parties never executed a written agreement concerning the long-term production of Oikos.[3]  Stonyfield, though, repeatedly told Agro-Farma that it intended a long-term endeavor and announced in a press release that the two companies had "partnered" together to create a new Greek yogurt.

The relationship between Stonyfield and Agro-Farma fell apart in the latter half of 2008, in part because of a dispute over pricing.  Stonyfield also claimed that the pH levels on substantial quantities of Oikos were too low, requiring destruction of the product, and therefore refused to pay Agro-Farma the outstanding balance due.  Agro-Farma denied that the yogurt was defective.  As a result of these disagreements, Agro-Farma stopped producing Oikos for Stonyfield in November 2008.  Stonyfield filed this suit against Agro-Farma in this court about a week later, alleging breach of warranty, breach of contract, and unfair competition under the New Hampshire consumer protection laws.

---

[3]The parties did reach a long-term agreement in July 2006 regarding the production of the original low-fat yogurt, which also contained a New Hampshire choice-of-law provision.

Stonyfield then resumed production of Oikos in January 2009 with Schreiber, a Wisconsin-based manufacturer that, according to Agro-Farma, had never before manufactured Greek yogurt. Stonyfield and Schreiber began discussing such an arrangement as early as March 2008, even before the relationship between Stonyfield and Agro-Farma deteriorated.  Agro-Farma alleges that, in order to resume production so quickly, Stonyfield must have shared with Schreiber confidential information that it learned from Agro-Farma about how to produce Oikos.  Now that Oikos is back on the market, it competes directly with Agro-Farma's own brand of Greek yogurt, called "Chobani."  Some stores have refused to sell Chobani because they already carry Oikos.

Facing this federal suit in New Hampshire, Agro-Farma filed its own parallel suit against Stonyfield and Schreiber in New York state court, which Stonyfield removed to federal court in the Northern District of New York.[4]  Agro-Farma then voluntarily dismissed the New York suit and instead brought its claims in this court as counterclaims against Stonyfield and Schreiber, which consented to joinder as a counterclaim defendant under Federal Rules of Civil Procedure 13(h), 19, and 20.

---

[4]See Agro-Farma, Inc. v. Stonyfield Farm, Inc., et al., No. 09-cv-00315-TJM-DEP (N.D.N.Y. 2009).

Specifically, Agro-Farma has brought the following eleven counterclaims:  (1) breach of contract against Stonyfield for violating the NDA; (2) trade secret misappropriation against Stonyfield; (3) trade secret misappropriation against Schreiber; (4) misappropriation of ideas against Stonyfield; (5) unfair competition against Stonyfield for willfully misusing Agro-Farma's confidential information; (6) unjust enrichment against Stonyfield and Schreiber for profiting off Oikos through the use of Agro-Farma's confidential information; (7) constructive trust against Stonyfield and Schreiber for all profits obtained from Oikos; (8) permanent injunction against Stonyfield and Schreiber to stop their use of Agro-Farma's confidential information; (9) cost of goods sold and delivered against Stonyfield; (10) account stated against Stonyfield; and (11) a UCC claim for recovery of the price of goods against Stonyfield.  Stonyfield and Schreiber have moved for judgment on the pleadings with respect to four tort claims:  counterclaims 4 through 7.

## III.  **Analysis**

The only disputed issue raised by this motion is which state's law applies to Agro-Farma's counterclaims:  New Hampshire or New York.  Stonyfield and Schreiber argue that New Hampshire law governs because of the choice-of-law provision in the NDA or,

alternatively, under general choice-of-law principles.  If so, both sides agree that New Hampshire's version of the UTSA pre-empts the four counterclaims at issue.  <u>See</u> N.H. Rev. Stat. § 350-B:7.  Agro-Farma argues, however, that New York law governs and provides no basis for pre-emption because New York has not adopted the UTSA.  As explained below, the court agrees with Stonyfield and Schreiber that New Hampshire law applies under both the NDA's choice-of-law provision and general choice-of-law principles, each of which will be addressed in turn.

## A.  *Contractual choice-of-law*

First, Stonyfield and Schreiber argue that New Hampshire law governs Agro-Farma's counterclaims because of the choice-of-law provision in the NDA, which states:  "This Agreement shall be construed in accordance with, and governed by, the laws of the State of New Hampshire, without application of its choice of law provisions."  NDA at § 9.1.  Agro-Farma argues that this provision applies, at most, to contract claims arising from the NDA and is inapplicable to the four tort claims targeted in Stonyfield and Schreiber's motion.  Because this court's jurisdiction is based on diversity, the relevant question is "what a [New Hampshire] state court would do with the choice of law provision."  <u>New Eng. Surfaces v. E.I. du Pont de Nemours &</u>

Co., 546 F.3d 1, 9 (1st Cir. 2008) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)).

It is well established under New Hampshire law that "[w]here parties to a contract select the law of a particular jurisdiction to govern their affairs, that choice will be honored if the contract bears any significant relationship to that jurisdiction." Hobin v. Coldwell Banker Residential Affils., Inc., 144 N.H. 626, 628 (2000) (quoting Ky. Fried Chicken Corp. v. Collectramatic, Inc., 130 N.H. 680, 684 (1988)). In this case, the NDA certainly bears a significant relationship to New Hampshire, where Stonyfield is located and where the parties held at least some business meetings. See, e.g., Allied Adjustment Svc. v. Heney, 125 N.H. 698, 700 (1984) (holding that a state bore a significant relationship "as the State of incorporation and the place of business of [one of the parties]"). Thus, the NDA's choice-of-law provision is enforceable as written. The more difficult question, though, is whether it extends to Agro-Farma's tort claims.

New Hampshire law provides no clear answer. Both the New Hampshire Supreme Court and the First Circuit Court of Appeals have applied contractual choice-of-law provisions to tort claims. See Hobin, 144 N.H. at 628-33 (misrepresentation claim and good-faith and fair dealing claim); Ne. Data Sys., Inc. v. McDonnell

10

<u>Douglas Computer Sys. Co.</u>, 986 F.2d 607, 609-10 (1st Cir. 1993) (unfair trade practices claim).  In both cases, however, the provisions were slightly broader than the NDA provision at issue here.  <u>See</u> <u>Hobin</u>, 144 N.H. at 628 (involving a provision that purported "to govern the agreement and [the parties'] 'legal relationships'"); <u>Ne. Data Sys.</u>, 986 F.2d at 609 (involving a provision that purported to govern "[t]his Agreement and the rights and obligations of the parties hereto").  Here, the provision addresses how the NDA should be "construed" and "governed," but contains no reference to the parties' broader "legal relationships" or "rights and obligations."

The court of appeals seemed not to ascribe much significance to this distinction, calling the two types of provisions "similar" and even citing a case that involved the narrower type of provision -- virtually identical to the one in this case -- to support its application of the broader type to a tort claim.  <u>Ne. Data Sys.</u>, 986 F.2d at 610 (citing <u>Scheck v. Burger King Corp.</u>, 756 F. Supp. 543, 545-46 (S.D. Fla. 1991)).  Other courts, though, have tended to view the distinction as significant and have been less willing to apply the narrower type of provision to tort claims.  <u>See</u>, <u>e.g.</u>, <u>Krock v. Lipsay</u>, 97 F.3d 640, 645 (2d Cir. 1996); <u>Black Box Corp. v. Markham</u>, 127 Fed. Appx. 22, 25-26 (3d Cir. 2005); <u>Benchmark Elecs., Inc. v. J.M. Huber Corp.</u>, 343

11

F.3d 719, 726 (5th Cir. 2003); <u>Green Leaf Nursery v. E.I. DuPont</u>
<u>de Nemours & Co.</u>, 341 F.3d 1292, 1300-01 (11th Cir. 2003); <u>but</u>
<u>see</u> <u>Nedlloyd Lines B.V. v. Super. Ct.</u>, 834 P.2d 1148, 1153-54
(Cal. 1992) (holding that even the narrower provisions generally
will apply to both contract and tort claims).

After surveying the case law, the Seventh Circuit Court of
Appeals has cautioned against giving it too doctrinaire or
mechanical an interpretation:

> One can, it is true, find cases that say contractual
> choice of law provisions govern only contractual
> disputes and not torts.  But what the cases actually
> hold is that such a provision will not be construed to
> govern torts as well as contract disputes unless it is
> clear that this is what the parties intended.  When it
> is clear, the provision is enforced.

<u>Kuehn v. Childrens Hosp.</u>, 119 F.3d 1296, 1302 (7th Cir. 1997)
(Posner, C.J.).  This reading is confirmed by a leading treatise,
which explains that "most American courts tend to view it as a
matter of contractual <u>intent</u>, which in turn depends largely, but
not exclusively, on the phrasing of the choice-of-law clause."
E. Scoles & P. Hay et al., <u>Conflict of Laws</u> 811 (4th ed. 2004)
(emphasis in original).

In addition to the language of the provision, the other
factor that attracts a great deal of attention in these cases is
the nature of the particular tort claims at issue -- and the

extent, if any, to which they hinge upon the contract.  For example, in Northeast Data Systems, where the court of appeals applied a choice-of-law provision to an unfair trade practices claim, it emphasized that the claim was essentially an "embroidered" contract claim, with an added allegation of "bad motive," and that it "would undermine the parties' choice of law agreement" to "permit[] one of them, through artful pleading, to bring what is little more than a breach of contract claim, under law that both parties have agreed would not apply."  986 F.2d at 609-10.[5]  Conversely, the court of appeals refused to apply the choice-of-law provision to a fraud claim, because that claim "concerne[d] the validity of the formation of the contract" and thus could not be viewed as contract-dependent.  Id. at 611; but see Hobin, 144 N.H. at 632 (applying choice-of-law provision to a misrepresentation claim).

---

[5]The court of appeals has expressed similar sentiments with respect to forum selection clauses.  See Lambert v. Kysar, 983 F.2d 1110, 1121-22 (1st Cir. 1993) (concluding that "[t]he better general rule . . . is that contract-related tort claims involving the same operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting parties," so as not to "reward attempts to evade enforcement of forum selection agreements through artful pleading of tort claims in the context of a contract dispute") (quotation omitted).  Courts have found Lambert's reasoning to be equally valid in the choice-of-law context.  See McAdams v. Mass. Mut. Life Ins. Co., No. 99-30284, 2002 WL 1067449, at *12 (D. Mass. 2002).

Here, the contract in question, which is a non-disclosure agreement, involves precisely the same subject matter as Agro-Farma's tort claims, all of which are based on the alleged disclosure and misuse of confidential information covered by the NDA.  In fact, at oral argument, Agro-Farma could not identify any allegedly tortious conduct that would not also constitute a violation of the NDA.  Agro-Farma protests that the tort claims could have been brought even if the NDA did not exist.  But the fact of the matter is that the NDA does exist and purports to "set forth the terms and conditions that apply when one party discloses Confidential Information to the other to ensure the protection of such information."  NDA, Recital 3.  While the NDA might not be Agro-Farma's only theoretical path to recovery for the alleged misappropriation of its confidential information, it is by far the simplest and most promising path.  See, e.g., Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd., 783 N.Y.S.2d 758, 770-71 (N.Y. Sup. Ct. 2004) (holding under New York law -- which Agro-Farma seeks to apply -- that to prove trade secret misappropriation the plaintiff "must show (1) that it possesses a trade secret, and (2) that defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means") (emphasis added); Oasis Music, Inc. v. 900 U.S.A., Inc., 614 N.Y.S.2d 878, 881 (N.Y. Sup. Ct. 1994)

14

(holding under New York law that to prove misappropriation of ideas the plaintiff must show "[f]irst a requisite legal relationship . . . between the parties," either "<u>based on an express contract</u>, an implied-in-fact contract, or a quasi-contract," and "second, the idea must be novel and concrete") (emphasis added).  Proving an intentional breach of the NDA would get Agro-Farma most of the way, if not all the way, to recovery under its various tort claims.  Thus, from a practical perspective, Agro-Farma's tort claims can fairly be described as "embroidered" contract claims, requiring "little more than a breach of contract" plus a "bad motive."  <u>Ne. Data Sys.</u>, 986 F.2d at 609-10.

While perhaps not every choice-of-law provision in a non-disclosure agreement will encompass tort claims relating to the misappropriation of confidential information, the language of this particular NDA strongly suggests that the parties intended for New Hampshire law to govern such claims, at least as pled by Agro-Farma in this case.  The NDA expressly provides that "the mutual objective of the parties hereto is to provide appropriate protection for Confidential Information . . . that the parties may learn or receive from each other in the course of their dealings and/or business relationship."  NDA, Recital 1. Similarly, the NDA provides that "the parties wish to enter this

15

Agreement to set forth the terms and conditions that apply when one party discloses Confidential Information to the other to ensure the protection of such information." Id. at Recital 3. Together with the choice-of-law provision, this language constitutes the best evidence of the parties' intent.[6]

This court therefore concludes that the NDA's choice-of-law provision requires the application of New Hampshire law to Agro-Farma's counterclaims.  A number of other district courts have reached similar conclusions in cases involving non-disclosure agreements and trade secret misappropriation claims. See, e.g., Facility Wizard Software, Inc. v. Se. Tech. Svcs., LLC, No. 08-C-5382, 2009 WL 2059934, at *4 (N.D. Ill. 2009); VFD Consulting, Inc. v. 21st Svcs., 425 F. Supp. 2d 1037, 1046 (N.D. Cal. 2006); Convolve, Inc. v. Compaq Computer Corp., No. 00-CV-5141, 2006 WL 839022, at *5 n.6 (S.D.N.Y. 2006); Dorazio v. Capitol Specialty Plastics, Inc., No. 01-6548, 2002 WL 31546171, at *4 (E.D. Pa.

---

[6]To the extent that Agro-Farma claims that it did not subjectively intend for the choice-of-law provision to govern tort claims, the New Hampshire Supreme Court follows the fundamental principle of contract law that contracts "are to be construed according to the intention of the parties as expressed in the language used therein and not according to an unexpressed intention which may have been in the mind of either of the parties." D. Latchis, Inc. v. Borofsky Bros., Inc., 115 N.H. 401, 404 (1975) (citation omitted).  Agro-Farma's subjective intent cannot override the objective intent expressed in the NDA.

2002); <u>but</u> <u>see</u> <u>Precision Screen Machs. Inc. v. Elexon, Inc.</u>, No. 95-C-1730, 1996 WL 495564, at *3 (N.D. Ill. 1996).

This court's conclusion is limited, however, in two important respects.  First, it applies only to the particular counterclaims alleged here by Agro-Farma and should not be construed to mean that the parties' choice-of-law provision would encompass other types of tort claims not tied so closely to the subject matter of the NDA.  Second, it applies only to Agro-Farma's claims against Stonyfield, not its claims against Schreiber, which was neither a party to the NDA nor an express third-party beneficiary.[7]  As explained below, to the extent that the NDA does not independently resolve the choice-of-law question, general choice-of-law principles nonetheless also favor the application of New Hampshire law to Agro-Farma's counterclaims against both Stonyfield and Schreiber.

---

[7]<u>Compare</u> <u>Paracor Fin., Inc. v. Gen. Elec. Capital Corp.</u>, 96 F.3d 1151, 1165 (9th Cir. 1996) (holding that a "choice-of-law clause . . . is a contractual right and generally may not be invoked by one who is not a party to the contract"), <u>with</u> <u>Hatfield v. Halifax PLC</u>, 564 F.3d 1177, 1182 (9th Cir. 2009) (allowing an express third-party beneficiary to enforce a choice-of-law provision).

**B.** *General choice-of-law principles*

The New Hampshire Supreme Court has identified five "choice-influencing considerations" that guide its choice-of-law analysis with respect to tort claims, absent a controlling choice-of-law provision.[8]  They are:  (1) predictability of results; (2) maintenance of reasonable orderliness and good relationship among the states in our federal system; (3) simplification of the judicial task; (4) advancement by the court of its own state's governmental interests rather than those of other states; and (5) the court's preference for what it regards as the sounder rule of law.  Ferren v. Gen. Motors Corp. Delco Battery Div., 137 N.H. 423, 425 (1993) (citing Clark v. Clark, 107 N.H. 351, 354-55 (1966)).  The relative importance of each factor varies depending

---

[8]There is some uncertainty about whether these five factors must be considered when there is an applicable choice-of-law provision.  The New Hampshire Supreme Court recently stated, in remanding a case, that the "court must consider" these five factors in determining "whether the parties' choice of law clause is enforceable."  Fog Motorsports No. 3, Inc. v. Arctic Cat Sales Inc., No. 2008-930, slip op. at 2 (N.H. Aug. 21, 2009). Historically, though, New Hampshire courts have enforced choice-of-law provisions without reference to the five factors.  See Hobin, 144 N.H. at 628; KFC, 130 N.H. at 684; Allied Adjustment, 125 N.H. at 700.  Whether or not the New Hampshire Supreme Court intended for Fog Motorsports to overrule, sub silentio, a long line of cases, cf. Collins v. City of Manchester, 147 N.H. 701, 703 (2002) (rejecting a purported sub silentio ruling as a misinterpretation), the outcome here does not depend on this issue, because the court concludes that New Hampshire law applies under both the contractual choice-of-law provision and the five-factor analysis.

on the type of case.  Id.  As explained below, all five factors
support the application of New Hampshire law to Agro-Farma's
counterclaims against Stonyfield and Schreiber, with the most
compelling factors here being predictability and simplification.

The first factor, predictability, "is usually implicated
only in suits involving contractual or similar consensual
transactions" and "emphasizes the importance of applying to the
parties' bargain or other dealings the law on which they agreed
to rely at the outset."  Keeton v. Hustler Magazine, Inc., 131
N.H. 6, 17 (1988) (citing Clark, 107 N.H. at 354).  This is such
a lawsuit.  At the outset of their relationship, Stonyfield and
Agro-Farma both signed an NDA with a New Hampshire choice-of-law
provision.  Whether or not the NDA independently resolves the
choice-of-law question, see supra section III.A, it certainly
made New Hampshire law the most predictable choice in a case
involving Stonyfield's allegedly unauthorized disclosure to a
third party of Agro-Farma's confidential information.  Cf.
Barrett v. Ambient Pressure Diving, Ltd., 2008 DNH 199, 3
(McAuliffe, C.J.) (concluding, under this factor, that product's
owner's manual established an expectation that English law would
apply to product liability claims, even though the plaintiff
never "agreed to be bound" by it).  The court therefore finds

that this factor weighs heavily in favor of applying New
Hampshire law.

The second factor, maintenance of reasonable orderliness and
good state relations, "requires only that 'a court not apply the
law of a State which does not have a substantial connection with
the total facts and the particular issue being litigated.'"
Keeton, 131 N.H. at 18 (quoting LaBounty v. Am. Ins. Co., 122
N.H. 738, 742-43 (1982)).  Here, both New Hampshire and New York
have a substantial connection with the case.  Even assuming that
New York has the more substantial connection, the New Hampshire
Supreme Court has expressly rejected the argument that this
factor favors the state of "greatest" significance.  Keeton, 131
N.H. at 18.  Multiple states can be -- and in this case are --
"sufficiently connected . . . to warrant further scrutiny" under
the other factors.  See LaBounty, 122 N.H. at 743 (finding that
three states met this hurdle).

The factor that weighs most heavily in favor of applying New
Hampshire law is the third one:  simplification of the judicial
task.  This case involves a variety of overlapping claims and
counterclaims, with closely related subject matter and legal
theories, asserted against parties located in three different
states.  Both sides acknowledge that New Hampshire law will
govern their contract claims arising under the NDA.  And the

NDA's choice-of-law provision requires that New Hampshire law be applied to Agro-Farma's counterclaims against Stonyfield.  See infra section III.A.  Applying a different state's laws to the claims against Schreiber, or even to some of the claims against Stonyfield (setting aside, momentarily, the choice-of-law provision), would make this case unnecessarily confusing and could lead to seemingly inconsistent results.  Conversely, applying New Hampshire law will ensure a consistent approach to all overlapping claims and all parties.  In addition, by applying New Hampshire law, the court will be able to consolidate a number of Agro-Farma's common-law claims into a single statutory trade secret claim, because of the UTSA pre-emption discussed infra at section III.C.  All around, the case will become much simpler to adjudicate.  While simplicity "is not the whole end of law, and opposing considerations may outweigh it," Clark, 107 N.H. at 354, the court sees no countervailing considerations that would outweigh it in this case.

The fourth factor, advancement of governmental interests, becomes important only when New Hampshire has a "particularly strong policy in reference to local rules of law," id., which the other states' laws under consideration would "fail[] to achieve." Lessard v. Clarke, 143 N.H. 555, 558 (1999).  Otherwise, New Hampshire's interest "is limited to 'the fair and efficient

21

administration of justice.'"  Id. (quoting Clark, 107 N.H. at
355).  Here, as in many other cases, this factor seems to be of
limited importance.  See LaBounty, 122 N.H. at 743.  To the
extent it carries any weight, however, this factor also favors
the application of New Hampshire law.  The New Hampshire Supreme
Court has noted that the purpose behind the UTSA is to create
"more certain standards" for the protection of trade secrets and
other confidential information, in response to the "uneven" and
"uncertain[]" standards that applied at common law.  Mortgage
Specialists, Inc. v. Davey, 153 N.H. 764, 775-76 (2006)
(quotations omitted).  Since New York has not adopted the UTSA,
its common-law framework would not achieve New Hampshire's stated
-- and arguably strong -- policy objective.

     The last factor is "the court's preference for what it
regards as the sounder rule of law."  Clark, 107 N.H. at 355.
This factor tends to play a "tie-breaker" role in close cases.
Scoles & Hay, supra, at 56 & n.25 (citing Lessard, 143 N.H. at
555, and Ferren, 137 N.H. at 423).  All other things being equal,
if one state's rule "lies in the backwater of the modern stream,"
LaBounty, 122 N.H. at 743 (quotation omitted), then the court may
choose to apply another state's rule that it regards as "wiser,
sounder, and better calculated to serve the total ends of
justice."  Benoit v. Test Sys., Inc., 142 N.H. 47, 53 (1997)

(citation omitted).  In this case, no tiebreaker appears
necessary, as all of the other factors support application of New
Hampshire law.  Were it needed, however, this factor would tip
the scales in favor of New Hampshire law.  Over the past three
decades, at least 44 states (including New Hampshire) have
adopted the UTSA in some form.  See Burbank Grease Svcs., LLC v.
Sokolowski, 717 N.W.2d 781, 792 (Wis. 2006).  New York is one of
a handful of states that have resisted this trend.  Given that
the vast majority of states have deemed the UTSA to be a sounder
rule of law, the court sees no basis for concluding otherwise.

This reasoning applies not only to Agro-Farma's
counterclaims against Stonyfield, but also to its counterclaims
against Schreiber.  Of course, the predictability factor carries
less weight with respect to Schreiber, since it was not a party
to the NDA.  But it still favors New Hampshire law, because
Schreiber allegedly obtained Agro-Farma's confidential
information through a relationship with Stonyfield, a New
Hampshire company, making New Hampshire law the most predictable
choice for Schreiber as well.  Moreover, the simplification
factor carries even more weight with respect to Schreiber,
because it would be especially confusing and needlessly complex
to apply different states' laws to the same basic claims brought
jointly against Stonyfield and Schreiber.  For all of these

reasons, the court concludes that general choice-of-law
principles require the application of New Hampshire law to all of
Agro-Farma's counterclaims.

## C.  *Pre-emption under UTSA*

In light of this court's conclusion that New Hampshire law
applies to Agro-Farma's counterclaims, both sides agree[9] that New
Hampshire's version of the UTSA pre-empts the four counterclaims
targeted by Stonyfield and Schreiber's motion -- i.e.,
misappropriation of ideas, unfair competition, unjust enrichment,
and constructive trust.  <u>See</u> N.H. Rev. Stat. § 350-B:7.  The New
Hampshire Supreme Court has interpreted the UTSA as pre-empting
common-law claims to the extent that they are "based upon the
misappropriation of trade secrets or other information."
<u>Mortgage Specialists</u>, 153 N.H. at 780.  Here, both sides agree
that all four counterclaims at issue fall within that category.
Having analyzed each of them, this court agrees with the parties
and therefore dismisses the four counterclaims as pre-empted.
<u>Cf.</u> <u>Ethypharm S.A. France v. Bentley Pharms., Inc.</u>, 388 F. Supp.
2d 426, 434 (D. Del. 2005) (deeming an unjust enrichment claim
pre-empted by the UTSA); <u>Digital Envoy, Inc. v. Google, Inc.</u>, 370

---

[9]Agro-Farma did not brief the pre-emption issue and conceded
pre-emption (if New Hampshire law applies) at oral argument.

F. Supp. 2d 1025, 1035 (N.D. Cal. 2005) (deeming unfair competition and unjust enrichment claims pre-empted by the UTSA); <u>Gray ex rel. Mid Atl. Lumber Co. v. Split Rock Hardwoods, Inc.</u>, No. 01-C-0043-C, 2001 WL 34373159, *5 (W.D. Wis. 2001) (deeming constructive trust claim pre-empted by UTSA).

Notwithstanding the pre-emption of those four counterclaims, the court notes that Agro-Farma retains its other seven counterclaims, including in particular its contract claim against Stonyfield under the NDA (Count 1), which is expressly exempted from the UTSA's preemption provision, <u>see</u> N.H. 350-B:7(II)(a), and its trade secret misappropriation claims against both Stonyfield and Schreiber (Counts 2 and 3), which will be governed by the UTSA.  <u>See</u> N.H. Rev. Stat. §§ 350-B (setting forth the elements of such a claim and authorizing various forms of relief, including compensatory damages, unjust enrichment damages, reasonable royalties, injunctive relief, exemplary damages, and attorney's fees).


**IV.  <u>Conclusion</u>**

For the foregoing reasons, Stonyfield and Schreiber's motion for judgment on the pleadings[10] with respect to Counts 4 (misappropriation of ideas), 5 (unfair competition), 6 (unjust

---

[10]Document no. 25.

25

enrichment), and 7 (constructive trust) of Agro-Farma's

counterclaims is GRANTED.

       **SO ORDERED.**

                              _____
                              Joseph N. Laplante
                              United States District Judge

Dated:    October 7, 2009

cc:  Peter S. Cowan, Esq.
      Robert J. Fluskey, Jr., Esq.
      Kevin M. Kearney, Esq.
      Thomas J. Donovan, Esq.a